1
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
2
**PENSACOLA DIVISION**

3

UNITED STATES OF AMERICA,        )
4                                )
                Plaintiff,       ) Case No: 3:18-cr-44/MCR
5                                )
        v.                       ) Pensacola, Florida
6                                ) July 17, 2019
                                 ) 9:02 a.m.
7    JUSTIN B. LANE,             )
                                 )
8                Defendant.      )
     _____)
9

10

                **TRANSCRIPT OF SENTENCING HEARING**
11          **BEFORE THE HONORABLE M. CASEY RODGERS**
                **UNITED STATES DISTRICT JUDGE**
12                  **(Pages 1 through 56)**

13

APPEARANCES:
14

For the Government:        United States Attorney's Office
15                         by:  **DAVID L. GOLDBERG**
                           21 East Garden Street
16                         Suite 400
                           Pensacola, Florida 32502-5675
17                         (850) 444-4000
                           *david.goldberg@usdoj.gov*
18

19   For the Defendant:        Federal Public Defender's Office
                           by:  **RANDALL LOCKHART**
20                         Three West Garden Street
                           Suite 200
21                         Pensacola, Florida 32502-5654
                           (850) 432-1418
22                         randall_lockhart@fd.org

23

24

                    *Julie A. Wycoff, RMR, CRR*
25              *Official United States Court Reporter*
                *(850) 470-8196 * julieawycoff@gmail.com*

1          **P R O C E E D I N G S**

2          *(Call to Order of the Court.)*

3                    THE COURT:  Good morning.  Mr. Justin Lane is before

4     the Court for sentencing.  He's represented by Mr. Lockhart,

5     who's also present.  Mr. Goldberg is here for the Government,

6     along with Agent Wight.  And from Probation we have Officer

7     Link.

8                    Mr. Lane is here for sentencing, having entered a

9     guilty plea to four counts of mailing threatening communications

10    and also threatened use of a weapon of mass destruction.  Those

11    are -- there are four counts, two incidents.

12                    His Base Offense Level as calculated under 2M6.1 is at

13    a 20.  There was four levels added for disruption of

14    governmental services, another three levels due to the fact that

15    the victim was a government officer or employee, Chapter 4

16    enhancement -- the Court has already entered a ruling in regards

17    to career offender status in the predicate offenses -- takes

18    Mr. Lane to a 37.  He was given credit for acceptance of three

19    levels.  His Total Offense Level is 34.  His Criminal History

20    Category is VI.  The recommended advisory guideline range is 262

21    to 327 months.

22                    Mr. Lockhart, I'd first ask that you confirm that

23    you've reviewed all drafts of the PSR, including the final, with

24    Mr. Lane before today; and then I'll hear from you regarding any

25    objections you wish me to consider.  Obviously not the one I've

1    already considered and ruled upon, but anything else I'll hear

2    from you on.

3             MR. LOCKHART:  Your Honor has summarized the draft and

4    final presentence report guideline as it's calculated currently.

5    I have reviewed both of those documents with Mr. Lane on

6    multiple occasions at the Walton County jail.  But the Court's

7    summary of the guidelines, as it stands right now, is accurate

8    as reflected in the final presentence report, Your Honor.

9             THE COURT:  Thank you.  Mr. Goldberg, does the

10   Government have any objections to the Presentence Report or

11   guideline calculation?

12            MR. GOLDBERG:  No, Your Honor.  But pursuant to

13   Document 50, which is the Court's order, I'm going to ask to

14   move in evidence Government Exhibit A.  It is simply the

15   judgment and sentencing documents for the defendant's prior

16   robbery conviction, which is part of that order.

17            THE COURT:  That'll be fine.

18            MR. GOLDBERG:  I'd prefer just to make it part of the

19   record.

20            MR. LOCKHART:  There's no objection to that, Judge.

21            THE COURT:  Okay.  Thank you.

22       (GOVERNMENT EXHIBIT A:  Received in evidence.)

23            MR. GOLDBERG:  Thank you.

24            THE COURT:  All right.  Mr. Lockhart, then, your

25   sentencing memo at Document 47 the Court has reviewed, along

 1   with character letters and also both the BOP eval, psychological

 2   eval, and the one from Red Hills as well.

 3           MR. LOCKHART:  Thank you, Your Honor.  And I'm

 4   assuming the Court's really referencing, I think, the seven or

 5   eight exhibits that were attached to the sentencing

 6   memorandum --

 7           THE COURT:  Yes.

 8           MR. LOCKHART:  -- which also include, even, the Walton

 9   County jail records, I believe.

10           THE COURT:  They're included as well, yes.

11           MR. LOCKHART:  Your Honor notes from all our materials

12   that we're asking for a 24-month sentence.  We're -- certainly

13   we have no objection and will leave it to the Court's discretion

14   in terms of the amount of the supervised release that it wants

15   to impose.

16           The Court obviously is very well aware of the fact

17   that Mr. Lane has a state release date of July 22nd of 2020.  So

18   he's currently serving his preexisting state sentences at this

19   time.  And then from December 19 of 2012, he has a 77-month

20   sentence from the Middle District of Florida, followed by three

21   years of supervised release, which will commence on 7-22 or 7-23

22   of 2020.

23           So as Mr. Lane sits here now, he still has a 77-month

24   sentence to serve that's related to the same -- I'll call it the

25   same or similar type conduct that we have in this case.  And

1    what's unique about the 77-month sentence, which I've tried to

2    articulate in a 20-plus-page sentencing memorandum, is that

3    unfortunately, at the time Mr. Lane was sentenced in that Middle

4    District of Florida case, not nearly as much was known about his

5    mental health, his background, his drug abuse, and essentially

6    just the conduct underlying the case.

7           What has become clear from a fairly exhaustive search

8    and investigation of Mr. Lane's history is that he has been the

9    subject of pretty significant abuse and neglect by his mother

10   and stepfather since age 3, essentially.  He doesn't know his

11   biological father, and that's -- all this is stated and drawn

12   out, not only in the draft but the final PSR, as well as the

13   sentencing memorandum, which draws off all of the exhibits that

14   are attached to that document, including letters from, as the

15   Court noted, Carol Fitch and William Hicks, who are essentially

16   his aunt and uncle, and even a family friend at the time when he

17   was a late teenager into his early 20s, a man named David Huff,

18   all of whom attest to the fact that Mr. Lane was subject to

19   neglect and abuse at pretty significant levels and that that

20   happened basically from the time that his mother remarried a man

21   named Jeffrey D'Amato when he was about 3 years old.

22          Jeffrey D'Amato was essentially his stepfather.  He

23   was into drugs and alcohol.  Mr. Lane's mother, Debra -- I'm

24   sorry, Brenda D'Amato, is also very much into drugs and alcohol.

25   They essentially neglected and abused Mr. Lane.  That was laid

1    out and established in the detailed letters by all three of

2    those individuals that I've mentioned, his aunt and uncle,

3    Ms. Fitch and Ms. Hicks, as well as David Huff.

4           And they show that the dysfunction that he was subject

5    to at a very early age was pronounced and substantial.  Things

6    like going -- waking himself up at an early age, having to take

7    himself to school, having to make his own breakfast, basically

8    going to school in old clothing, references to a very

9    dysfunctional home, references to lack of hygiene, references to

10   statements that are -- were hurtful or, quote, mean, as stated

11   by his aunt and uncle.  Essentially a significant amount of

12   emotional abuse and neglect from his own mother, which I would

13   point out is the case even to this day.

14          This case has been pending for a significant amount of

15   time.  I don't have the indictment date in front of me.  But

16   we've been, just for example, Your Honor, trying to contact his

17   mother since this case began, probably roughly about a year ago,

18   and we've had no luck.  He essentially, even to this day, has

19   really no family support whatsoever.  Our efforts to try to even

20   reach Carol Fitch and William Hicks were substantial.  He just

21   doesn't have any support system, and he certainly didn't at that

22   time.

23          But Ms. Fitch and Mr. Hicks both substantiate that he

24   was -- probably the worst end of it, other than just neglect

25   from one's own biological mother, is the fact that he grew up

1    thinking that Jeffrey D'Amato, his stepfather, was his

2    biological father and didn't know that he wasn't until he

3    essentially was approximately age 15 or later.

4            And that's particularly hurtful because Jeffrey

5    D'Amato was a very mean and aggressive person.  Mr. Lane has, in

6    multiple documents, been documented as having pointed out that

7    he was hit in the head, that he was punched, that he was shoved,

8    that he was neglected, that he was made to know on a regular

9    basis that he wasn't Jeffrey D'Amato biological son, and that

10   essentially he didn't matter.

11           Similar statements came from his mother to the form of

12   "I hate you" and "I should have killed you before you were

13   born," things of that nature.  And all of those things, together

14   with his lifestyle and his background and his upbringing, all

15   the way up until the time that he became a runaway around --

16   between -- on and off between the ages of 12 and 15, have been

17   substantiated.

18           There are even Children and Family Services records

19   that don't detail any findings of abuse or neglect by his mother

20   and stepfather but do point out that he was shown to have had

21   injuries that were reported to Children and Family Services, for

22   example, when he was of school age.  I mean, there's just all

23   kinds of -- it's one of the worst backgrounds I think that I've

24   seen.  It certainly ranks right up there.

25           Even stories are just myriad of the abuse and neglect,

1    such as Mr. Lane having his front teeth knocked out at school

2    and having the school suggest to his mother that he come back

3    and make an appointment to a dentist where that could be taken

4    care of, and she just basically never scheduled it, for example.

5            We know from his school records that up until the time

6    that he ran away, and even afterward, when he was in his early

7    teens, he finished out his high school classes, before he became

8    a dropout, in the Palm County jail, where he was still doing --

9    he was placed in emotional and behavioral disabled classes.  He

10   regularly had fights at school.  He was teased due to having a

11   speech impediment.  He was teased as a result of the clothes

12   that he had to wear to come to school.  I mean, he essentially

13   had to raise himself in this atmosphere.  And that's, again,

14   well substantiated.

15           And not only that, what we've seen and what

16   Dr. Spoerl's report picks up on is the fact that that kind of

17   history has had long-term consequences for Mr. Lane, particular

18   in terms of how he sees other people and in terms of his own

19   view of himself, which is in terms of having feelings of

20   worthlessness, uselessness, things like that.

21           And we also see from -- and this goes right from early

22   age to the time that he was a runaway, from 12 to 13, right into

23   the time frame where he has his first juvenile finding from the

24   court.  So he's having his first law enforcement contacts at

25   around age 15.

1          So he ran away from 12 to 13.  His first law

2     enforcement contact was 15.  He had his first adult sentence at

3     18, and he was permanently imprisoned by the time that he was

4     age 22, and he's literally been incarcerated since that point in

5     time.  He's still technically serving the robbery conviction

6     that's in the presentence report at paragraph 42.  And that, as

7     I mentioned, doesn't expire until July of 2020.

8          So he goes from having this, just, pronounced history

9     of abuse and neglect to going into the streets, where he

10    essentially began to be old enough to manifest signs of mental

11    health issues, which, again, we do see that in the educational

12    records because, of course, he was in emotional and behavioral

13    disabled classes, so he was essentially in ESE classes at the

14    time.  We know he had a speech impediment.  We know that there

15    were thoughts of suicide.  And so from an early age he's had --

16    there's certainly been a mental health component to Mr. Lane's

17    background and upbringing.

18         But then also, of course, we have him being on the

19    streets, him having access with really no structure to older

20    people.  There's even a reference of him having some gang

21    involvement or being around gang members at the time in his

22    neighborhood.  We know from David Huff that he was hanging

23    around older people.  Mr. Huff himself admits to being a very

24    bad influence.  Mr. Huff at this time is incarcerated in the

25    State of Florida correctional institution himself.  And so --

1     and we see that from Mr. Lane's criminal history.

2            He received his first substantial sentence in May of

3     2002, which was a -- at age 18 where he was -- well, in -- yeah,

4     he went into custody in May of 2002.  He had a 42-month

5     sentence.  And so between the ages of 18 and 22, he has only

6     really been released from a correctional environment for a

7     single -- about a year and three months.  There was a VOP in

8     that case, and so at age 22 he went into custody on March 20 of

9     2006; and, Your Honor, he's been in the Florida Department of

10    Corrections ever since.

11           What we see from all of this, and what Dr. Spoerl

12    references, is that this has had a significant impact on him.

13    And the mental health in particular shines out for sure from the

14    Florida Department of Corrections records, as well as the evals

15    that have been done at the Walton County jail, as well as --

16    just the findings from the Walton County jail even today, as

17    well as the original BOP eval, if I didn't mention that, but

18    obviously Dr. Spoerl's report as well.

19           But having combed the Florida Department of

20    Corrections records for him for nearly the last 20 years, she

21    points out that there are marked indicators of him having

22    significant issues with depression, that -- significant issues

23    of emotional instability, poor coping skills, that he's prone to

24    what she calls self-injurious behavior.  She references, for

25    example, multiple orders of suicide watch within the Florida

1    Department of Corrections, as well as multiple admissions to

2    crisis stabilization units, as well as transitional care units,

3    and that his insight is obviously poor.

4          And she states that there's a substantial amount of

5    research and literature that supports that folks that grow up at

6    a very young age in this environment have these sorts of issues

7    and so that it obviously causes delayed or impaired ability to

8    be able to react to situations, particularly where they don't

9    ever have -- they've never had that background where they can

10   ultimately establish trust in individuals.  And that's where she

11   references an antisocial personality disorder, together with a

12   primary diagnosis of bipolar disorder.

13         She summarizes, just for example -- and this is also

14   backed up in the presentence report, but she notes that even

15   within the -- and I'm sure this is -- virtually certain this is

16   also referenced in the BOP evaluation -- that he has been

17   diagnosed variously, since he's been in the Florida Department

18   of Corrections, with PTSD, bipolar disorder, antisocial

19   personality disorder, conduct disorder, polysubstance abuse

20   disorders of various kinds, and provisional rule-out diagnoses

21   for psychoses and schizophrenia.

22         Notably, as well, he's been diagnosed and --

23   similarly, and then recommended or prescribed drug treatment of

24   one form or another, which pretty much looks like it spans the

25   sphere of antidepressants, mood stabilizers, and antipsychotics,

1    which includes Buspar, Celexa, Depakote, Effexor, Prozac,

2    Remeron, Risperdal, Seroquel, Thorazine, Wellbutrin, and

3    Zyprexa, the last five of which are antipsychotics.  The

4    Depakote is a mood stabilizer.  The Celexa, the Prozac, for

5    example, the Remeron, those are -- would be examples of things

6    that he's been prescribed that are antidepressants.  He's on

7    Wellbutrin currently from the Walton County jail.

8         And I would drop a footnote at this point and

9    reference that when he came into the -- he originally was

10   brought to Santa Rosa County jail when this case first was

11   indicted, and then within a short period of time -- and he was a

12   mess when he got there.  Within a very short period of time, the

13   marshals moved him to Walton County jail, and at that point in

14   time -- that's why I attached the Walton County jail records

15   from the time that he was there, which also overlap with

16   information that I've gotten from the Government some time ago

17   that there had been additional similar letters, these phony

18   anthrax letters that are signed by him and sent out, from Walton

19   County jail.  And if I'm correct, that happened around

20   May 23rd of 2018.

21        And during that time, Walton County -- those records

22   reference that he was agitated, angry, suspicious, and that they

23   were concerned about him in terms of his mental health.  There's

24   also references within those records during that time and around

25   that time to delusional disorder.  And it was a short time

1    thereafter that he was ultimately sent, on my motion, to the

2    Bureau of Prisons for a mental health evaluation.  And, of

3    course, they didn't ultimately find that he suffered from the

4    delusional disorder after extended study and observation; they

5    ultimately found other serious mental health problems.

6            They indicated that he was diagnosed with disruptive

7    disorder, impulse control disorder, anti personality [sic]

8    disorder, and they prescribed him an antipsychotic and an

9    antianxiety drug, which is Abilify and Buspar.

10           That eval coincides with Dr. Spoerl's diagnoses and

11   recommendations where she ultimately finds that there's solid

12   evidence to conclude that these letters are coinciding with --

13   like the equivalent of hypomanic events on behalf of Mr. Lane.

14   In other words, when he gets in a bad place within the Florida

15   Department of Corrections and he's not on medications, for

16   example, or for whatever reason he's just not stable, it appears

17   that that's when we have this sort of conduct.

18           I can certainly proffer to the Court -- and this will

19   be backed up contemporaneously with the motion that I filed at

20   the time seeking to have the Court send Mr. Lane to BOP -- that

21   he was extremely difficult to deal with, that he essentially was

22   a completely different person than he has been over the last

23   several months and as he sits here today, fully regulated on the

24   antidepressants.

25           It's hard for me to say -- I believe there is a

1    reference from Dr. Spoerl that stated -- or possibly Walton

2    County that stated that when he came in he certainly was not on

3    antidepressant medication, at least when he was at Walton County

4    in May of 2018.  But regardless, for whatever reason, whether

5    it's lack of medication, lack of adequate mental healthcare, or

6    just mental healthcare that's not properly calibrated to his

7    impairments and his background and history, it appears that when

8    we see these letters, it's where Mr. Lane is not in a good

9    place.

10          And I would say that's also underscored by the fact

11   that the letters in this case were sent to Polk County, and

12   there's really no explanation as to why they would have been

13   sent to the Polk County State's Attorney's Office.  When

14   Mr. Lane was asked about the offense and whether he mailed the

15   letters, I believe that he was honest about that and said he

16   didn't really have much recollection of it.  And there's no

17   indication, to my knowledge, that he's ever had a case in Polk

18   County.  So that would somewhat support that when these letters

19   went out that he really wasn't in the best mind state.

20          Now, I'm not saying -- and we fully laid out and

21   Dr. Spoerl has said this.  We're not saying that he was insane

22   at the time.  I'm not saying that.  But it's certainly clear --

23   when there's lists like this of diagnoses from the Florida

24   Department of Corrections, as well as lists of mood stabilizers,

25   antidepressants, and antipsychotics, and where he's on an

1    antipsychotic and an antidepressant now and doing very well,

2    appears to be very well regulated, it's just extremely relevant

3    to this offense, particularly where -- and it dovetails entirely

4    with his background and history, which is some of the worst that

5    we've ever seen.

6           And unfortunately, none of this information, or at

7    least close to none of it, was available when Mr. Lane received

8    a 77-month sentence for sending, I believe, two fake anthrax

9    letters in the Middle District of Florida, and so that resulted

10   in a 77-month sentence.

11          Obviously it would be total speculation to know

12   whether or not -- I don't know anything about that judge at the

13   time, but I did have the presentence report.  I have actually

14   talked to the probation officer down there; and I do know that

15   when we talked to Mr. Lane's family, the only person that was

16   ever talked to by the probation office or the defense lawyer was

17   William Hicks, which is the uncle that has submitted one of the

18   letters.  But unfortunately none of this was fleshed out.  The

19   Children and Family Services records were never obtained.  The

20   education records were never obtained, and we just didn't have

21   kind of the cumulative history and knowledge about Mr. Lane and

22   what is kind of undergirding this conduct and behavior like we

23   do now.  And it's incredibly mitigating.

24          So for all these reasons, Your Honor, that's

25   essentially why Dr. Spoerl thinks that Mr. Lane is acting out

1    when he does act out.  And it's certainly closely linked to

2    serious mental health problems.  I think it's additionally

3    complicated because -- she points out, for example, that, you

4    know, that are layers to all of these things.

5            So you have the abuse and neglect, and then you have a

6    significant lack of education.  You have the mental health

7    issues that you have, you have polysubstance abuse.  All those

8    things kind of culminate together.  And ultimately what

9    Dr. Spoerl says is that he's obviously going to need therapy for

10   the abuse and neglect from his childhood and upbringing.  For

11   example -- and it's heartbreaking to the extent that he has a

12   tattoo of his mother's name on his arm; and his mother, even to

13   this day, wants nothing to do with him.

14           It's incredibly significant in that, you know, that is

15   Mr. Lane's mother.  He's not going to stop loving her, no matter

16   what she's done do him; and she's abused and neglected him,

17   either directly or indirectly, by not doing anything to stop her

18   former husband's behavior, such that he largely went from their

19   care, if you want to call it that, to the streets and then to

20   the Florida Department of Corrections since roughly, like, 2006,

21   with a gap of about a year and three months in between; and he's

22   still incarcerated there to this day.

23           Now, I can't speak to the quality and extent of the

24   mental health treatment that he's gotten there.  His Florida

25   Department of Corrections records, frankly, are enormous.

1    They're probably in three or four bankers boxes, and they

2    stretch -- and that's just from the period that I think we

3    obtained from 2010 until, roughly, late 2017.

4            But, you know, it's obvious that he's had significant

5    issues in there and -- but those records do not reflect -- and

6    this is not surprising.  He's not received one minute of therapy

7    in relationship to what's really caused this, which, of course,

8    is the abuse and neglect from his family and the -- just the

9    lack of any care or concern from his own mother.  He still, to

10   this day, doesn't even know who his biological father is.

11           And so for all those reasons, that has gone

12   unaddressed; and, of course, that's the foundation for the drug

13   addiction as well, as well as the mental health issues that come

14   from it.  So that's something that absolutely needs to be

15   addressed, and I'm much more confident that that can be

16   addressed in the BOP.  I think it's best addressed, of course,

17   when he's out on supervised release.

18           And that's something that Dr. Spoerl talks about is

19   that he obviously would need therapies to address what's

20   happened to him as a child in relationship to his "parents," and

21   that can be addressed in therapy.  And she also points out that

22   his anti personal -- or antisocial disorder, rather, is also

23   something that can be adequately addressed.  And that's kind of

24   the markers of not necessarily being able to trust people

25   because of his background and experience with folks like his

1    mother and his stepfather, who basically abused him.

2            We know, just for example, that even one of his

3    juvenile convictions was a battery from -- that supposedly

4    occurred on his own stepfather, and that's kind of the

5    relationship that they had.  It was a very abusive relationship.

6    And we know, again from Carol Fitch, who pointed out that she

7    had seen him on multiple occasions hiding under beds, hiding in

8    closets, and hiding in corners.  And Mr. Lane has said very

9    bluntly in PSR interviews that he was, quote, scared to death of

10   this man.

11           And so again, that's the background that we have until

12   he's about 15.  And then by the time he's 17, we've got him in

13   custody for the better part of his adult life, with the

14   exception of just a year gap.

15           So, you know, that's the man, and that's ultimately

16   what he needs.  So he needs the therapy, obviously.  I believe

17   that Dr. Spoerl even referenced CBT, mindfulness training.

18   People may laugh at those things; but frankly, that is at the

19   cutting edge of technology in relation -- and what literature

20   knows about how to treat people with this kind of background and

21   history.

22           And the idea behind that is to be able to deal with

23   the abuse and neglect but then also to give him some coping

24   tools to be able to address not only these feelings of

25   uselessness and worthlessness and the isolation and the

loneliness from being incarcerated in the Florida Department of

Corrections for almost 20 years with no family support at all

but also to allow him to begin to be able to trust people.  And

that, ultimately, of course, is a key component of having him

take advantage of any vocational training and ultimately be able

to release into society and do something with himself in a

meaningful way.  And that's something that -- I believe you're

going to hear from Mr. Lane that's something he certainly wants

to do.

He does look forward, at some point, to being

released.  He knows that he's got to be stabilized on

medication.  He has been very compliant with his medications

since he's been in what I would call federal custody, where he's

been in either BOP or the Walton County jail.  And just

because -- and I would point out, just because someone is in

jail doesn't necessarily mean that that means that they're going

to be medication compliant.  But he has, and I can't emphasize

this enough.

Since he has been in custody and come back from the

BOP, he has, from my standpoint -- and I can proffer this --

been a different person in the sense that it changes his whole

outlook.  He's much more calm.  He's well-reasoned.  He doesn't

have the same kind of impulses and the inability to process them

and decide what decisions to make and know in advance how

they're going to impact him.

1          And I'm sure that his ability to do that, even on

2    Wellbutrin, for example, is still blunted because of the

3    severity of the background and history that's caused that

4    problem, but it has made a marked difference.  And if -- through

5    BOP and beyond, if we could get him an intense amount of hours

6    in terms of just dosage of treatment to help him deal with his

7    background and history -- he's a 34-year-old man, so he's got

8    the rest of his life in front of him, and this is something that

9    can be addressed through treatment.

10          But I think it's very important that when we look at

11    these letters, particularly when we see the ones that were

12    getting sent out in Walton County, and we look at what we know

13    about that and we look at the mental health indications at that

14    time and we look at the fact that he was sent to BOP around that

15    time, it fully supports Dr. Spoerl's position that these very

16    likely occurred -- these letters were very likely sent when he

17    was in hypomanic states, not doing very well.  And obviously

18    this case occurred when he was incarcerated at the Florida

19    Department of Corrections.

20          And the references that I've made to the Florida

21    Department of Corrections' records in terms of all these

22    diagnoses and all these various medications of the

23    antidepressants, antipsychotics, and mood stabilizers were all

24    in play during that same time.  There's no doubt about that.

25    That is his longstanding history.

1              And so I think that's the most, kind of, important

2    component of this sentence and what it should reflect is his

3    background, and then what we know about him, and then what was

4    going on with him most likely at the time that these letters

5    were sent.  They don't make any sense.

6              For example -- and this kind of segues into the

7    severity of the offense.  The letters that were sent, for

8    example, to Polk County State's Attorney's Office just make no

9    sense.  I mean, what retributive motivation would Mr. Lane have

10   to send a fake anthrax letter to a prosecutor's office where

11   he's never even had any prior case?  And so, for example, it

12   just further underscores what we're talking about in terms of

13   not likely well thought out.

14             Certainly, when you look at the letters, too, Judge,

15   likely the product of some kind of mental health event.  But

16   when you look at the letters, too, not at all sophisticated.

17   The letters -- essentially he fills out the return section of

18   the envelopes.  He literally says, you know, Justin Lane.  He

19   puts down his inmate number.  He puts his address down.

20             So he states, Santa Rosa Correctional Institution

21   Annex.  He puts the address there, Justin Lane,

22   Number W16844Q-1106S on one letter.  And on the other letter he

23   states, Justin B. Lane -- this is on that return envelope

24   section -- Inmate Number W16844.  And then he essentially writes

25   one-page letters that say the equivalent of "die, anthrax,

1   good-bye."  Literally that brief, and he literally signs Justin

2   B. Lane at the bottom.

3           So law enforcement didn't have to do much to track

4   this man down.  Even if he hadn't had a prior case where he had

5   sent similar letters like this, he signed them.  We don't have a

6   case, like we do in a lot of anthrax cases, where somebody sends

7   kind of an anonymous -- I'm sorry, an anonymous letter or where

8   they take on, kind of, identities or nicknames or things like

9   that, where it requires a lengthy and expensive law enforcement

10  investigation in relationship to be able to bring this person to

11  justice.  The envelopes clearly reflect that he was an inmate

12  from the state penitentiary.

13          And we've pointed out that law enforcement, of course,

14  would know that this is impossible for him to carry out.  A

15  person in society, particularly someone who's incarcerated, has

16  no ability to obtain anthrax, and that's just a fact.  This was

17  either dry toothpaste or some kind of talcum powder.

18          We've cited references in the sentencing memo that

19  come from respectable sources that indicate that it's a very

20  sophisticated process to be able to obtain, much less produce

21  and create, the kind of weaponized, powderized type anthrax that

22  was used in 2001, which is the only anthrax case that we've ever

23  seen.  And as we pointed out in the sentencing memo, that came

24  from an individual -- I believe his name is, like, Dr. Bruce

25  Iyers [sic], who essentially had worked within the government

1    and had access to specialized biological agents like anthrax,

2    and so that's how they were able to focus in on and make him a

3    suspect.

4           We cited, for example, the FBI's own report on that

5    investigation.  And interestingly, that same report, which I

6    cite in the sentencing memo, also reflects kind of a summary of

7    folks that were -- other individuals that were suspected of

8    having the ability of being able to do something similar.  And

9    those individuals all had incredibly sophisticated backgrounds.

10   I think they had Ph.D.s or had specific experience, largely,

11   either in foreign countries in this area or worked in biodefense

12   or had some access to kind of a highly specialized lab.

13          So how that compares to Mr. Lane, who has been

14   incarcerated since the better part of age 15, has served his

15   entire sentence at a state prison facility, and essentially puts

16   some powder in an envelope with his name on the envelope and his

17   name literally signed on the two letters that are one page, that

18   are not sophisticated at all to the extent that say, "Die,

19   anthrax," leaves no credible claims or context in the letter to

20   believe that this person actually had the ability to carry this

21   out and, in fact, he just simply doesn't.

22          I think what's important about that is that where he's

23   charged the way that he's charged, which is certainly legal,

24   acceptable.  It's done throughout the country in some districts.

25   It's done here, I would submit, much more frequently than what

1   we see in other places.  But the way that he's charged has a

2   significant impact on his guidelines and the result of that,

3   particularly where he does happen to have a criminal history,

4   which makes him a career offender.  And so he goes from,

5   essentially, roughly a five-year sentence if he were charged

6   under either of the other two statutes that I've noted, which is

7   1038, for example, and 876(c).

8           1038 is a statutory statute, Your Honor, that's

9   basically -- it's a Class D felony.  It's Title 18, U.S.C., 1038

10  subsection (a)(1), False Information and Hoaxes; and it carries

11  a five-year maximum.  It uses the same guideline, 2A6.1, as any

12  kind of conviction that you have under 876(c), which is kind of

13  like the next step up, which is mailing threatening

14  communications.  That's a Class C felony.  It has a ten-year

15  max.

16          Here, of course, where Mr. Lane is charged with use or

17  attempted use of a weapon of mass destruction, which is a phony

18  anthrax letter that he sent from a state prison with dried-up

19  toothpaste, we're using, of course, 2M6.1, which creates a Base

20  Offense Level of 20.  If you look at the federal sentencing

21  Guideline Manual, a Base Offense Level of 20 also encompasses

22  other folks -- and I've articulated in the sentencing memo --

23  that actually have committed offenses involving real weapons of

24  mass destruction that fall under that guideline.

25          So it's an enormous disparity that gets created, and

1   that's not even to talk about the career offender provision.  So

2   if we calculated his guideline under 2A6.1 as if he were just

3   charged as 876 or 1038, his guideline range, like I said, would

4   be about 51 to 63 months in Cat VI.  So then --

5           THE COURT:  See, I have that calculated differently.

6   I have it calculated at mailing threatening communications would

7   be 77 to 96 months; and under 1038, it would be 37 to 46 months.

8           MR. LOCKHART:  Well, there is -- because of the

9   different specific offense adjustments, it is possible where

10  there are some -- there are different ways in which you could

11  calculate it almost on the same facts.  I tried to calculate it

12  as conservatively as I could.

13          The way I calculated it and laid it out in my

14  sentencing memo, I believe I came out to 51 to 63 under 2A6.1.

15  And under 2M6.1 -- and that -- and under 2A6.1, it was a Base

16  Offense Level of 12, plus 4 for disruption, and I had plus 4 for

17  official victim, for example.  And so that would result in an

18  Offense Level of 20.  With acceptance of responsibility, he'd be

19  at 51 to 63 months.  And, of course, this isn't considering

20  career offender.

21          THE COURT:  Right.  And that -- but you have to

22  consider that --

23          MR. LOCKHART:  Absolutely.

24          THE COURT:  -- because I've ruled --

25          MR. LOCKHART:  Absolutely.

1          THE COURT:  -- on that issue.

2          MR. LOCKHART:  This is just an illustration in terms

3   of where we would be and just --

4          THE COURT:  Okay.

5          MR. LOCKHART:  It gives the Court an idea of the

6   different levels of severity based on the charging decision and

7   what guideline we're using.

8          So if we go to 2M6.1, I had him just like we have him

9   in the presentence report before career offender is applied.

10  He's at 100 to 125 months, so that doubles, essentially, the

11  sentence.  And then when he's a career offender, he goes from

12  100 to 125, to 262 to 329.  So, you know, essentially, on the

13  high end, more -- it's more than four times the sentence, and I

14  think, you know, it's just hugely important.

15         I think when we look at his background and history, we

16  look at his mental health, and we look at the type of offense

17  that's committed -- and one of the more important things is that

18  anthrax -- again, I can't underscore this enough.  It's not --

19  we've had -- in the United States, we've had one anthrax case

20  since 2001.  That's -- or period, to my knowledge.

21         It's certainly the most highly publicized anthrax

22  case, obviously, because it happened around 2001; and, you know,

23  obviously it was directed at members of Congress, so it was

24  hugely memorable at the time.  At the time for me, for example,

25  I was a federal law clerk in the Eastern District of Michigan,

1    and obviously I remember what we were having to do in the

2    mailrooms for incoming mail at that time, in the clerk's office

3    and things of that nature.

4           So I fully understand, in making these representations

5    that the use of real anthrax -- or even the use of phony anthrax

6    from folks that are not incarcerated, who cannot be easily

7    identified and run down, or the people that do similar threat

8    letters but don't clearly identify themselves in the materials

9    that they send, are a different class of case because it causes

10   law enforcement many more headaches.  It causes significant more

11   disruption.  It causes much more panic in relationship to the

12   people that open the letters.

13          And in this case, luckily for Mr. Lane, it was

14   actually opened by law enforcement.  And certainly we -- I could

15   make the argument that law enforcement obviously should have

16   known that where this comes from, a state penitentiary inmate

17   who's clearly identified himself, that there was no possible

18   way, in fact or otherwise, for him to have had access to any

19   kind of real biological agent.

20          But nonetheless, we're not objecting to the

21   substantial disruption, and we're also not objecting to the

22   restitution.  I recognize that to a certain extent protocols

23   have to be followed when these letters get sent.  It's just a

24   fact of life because we never know whether we're going to have

25   another Dr. Bruce Iyers again, and so everyone has to be on

1   alert.

2           But at the same time, I think the Court's chasing its

3   tail to try to impose any kind of substantial sentence on

4   Mr. Lane on these facts with his background and history and his

5   mental health issues.  It's not an excuse.  It's a full-blown

6   explanation, and I would submit -- and it's not a justification,

7   but it is a well-established fact.  His record is a

8   well-established fact.

9           And I would submit that we do see -- as I pointed out,

10  there are a myriad of examples of folks that have sent similar

11  letters who did not identify themselves, where law enforcement

12  had to spend considerable resources chasing them down, who

13  received sentences that don't even approach the 77 months that

14  Mr. Lane got in the Middle District of Florida where he sent two

15  letters, very identical, identified himself, and he signed those

16  letters too.  But, again, giving that court the full benefit of

17  the doubt, none of this background and history -- at least most

18  of it -- was not even known at that time.  Just that work was

19  never done.

20          So, you know -- and I -- in researching this and in

21  cross-referencing cases that you see in the news with PACER, so

22  to be able to ensure their adequacy and accuracy, there are just

23  scores and scores and scores of these cases.  And I was even --

24  so much so that I was even able to find a *Washington Post*

25  article that even indicated that the sentences in anthrax hoax

1    cases are all over the board, that they largely range from

2    probation, it can be as low as 20-some-odd months.

3            When we look at the sentencing guideline statistics

4    for 2A6.1, which covers 876(c) and 1038, the averages in 2017

5    were 25 months; and I believe in 2018, it was something like 28

6    months.  It went up a little bit -- or it's 25 and 27 months.

7            It's difficult to know what the average sentence would

8    have been under 2M6.1 because, of course, here we have career

9    offender; but at the same time, the average for 2018 was 52

10   months.  But, of course, that guideline again references cases

11   and encompasses cases that do involve real weapons of mass

12   destruction.  So isn't that instructive, too, where obviously

13   he's a career offender, but at the same time where we know that

14   2M6.1 also encompasses real cases involving real weapons of mass

15   destruction, that the average sentence is 52 months?  I mean,

16   we're not anywhere near his guideline range, nowhere near, nor

17   should we be, based on what is known about him and the specific

18   offense.

19           But I would say, the last part about just the offense

20   and the severity of it was that it's -- these cases are unique

21   in the sense that they're not bomb hoax cases.  There's no way

22   for Justin Lane, even if he somehow had access to the internet

23   in the Florida Department of Corrections, or anywhere else, to

24   be able to go and learn how to do anthrax to be able to pose

25   some realistic threat to anybody.  And that's not the case if we

1    were here on a bomb threat case where Your Honor, I'm sure,

2    could take judicial notice of the news where -- I think we've

3    all sat in the area of post-2001 where *NBC News* or *CBS News* or

4    something like that, will come on, some news production program

5    where it'll talk about how you can go on the internet and

6    essentially learn to be a terrorist and make very crude bombs

7    that are available online, if people have the means or know-how

8    to do so.

9            So that's unique and relevant because if I call in a

10   bomb threat, or even if I'm incarcerated and call in a bomb

11   threat, law enforcement has no way to know whether or not I

12   actually have the ability to carry out that threat, even if they

13   know I'm a prisoner.  And that is not the case with an anthrax

14   hoax.  It just simply cannot be obtained by Mr. Lane.  It's

15   literally -- we submit it's impossible.

16           Just, for example, on page 6 of our sentencing

17   memorandum, we cited a source from the Department of

18   Epidemiology from UCLA which basically was summarized as

19   stating -- detailing generally the history of anthrax being used

20   as a weapon and stating that the production of anthrax in

21   powdered form to be used as an effective weapon is, quote, a

22   complicated and expensive process, end quote, that, quote,

23   requires the use of large centrifuges for repeated washings and

24   then intensive drying to produce the concentrated military-grade

25   power.

1          Another reference, FBI's theory on anthrax is doubted,

2     which is from, I believe, 2002.  It -- talking about the FBI's

3     investigation of the real anthrax case in 2001, which is the

4     only one, of course, we've had, it states:  Stating agreement

5     among scientists and biological warfare experts that weaponizing

6     the powdered aerosol form of anthrax requires extensive

7     scientific knowledge, technical competence, access to expensive

8     equipment, and safety know-how that are beyond the normal

9     capabilities of most scientists.

10          So again, I think it is particularly unique where he's

11    incarcerated, has no ability to access this.  It's completely

12    separate from something that you'd see, even if this was a bomb

13    case, something that doesn't allow law enforcement to easily

14    kind of -- no pun intended -- defuse the situation.

15          Here, obviously, it does have an impact.  We recognize

16    that.  But it's much, much more unique in the sense that it's

17    minimal, and this offense wasn't committed in any kind of

18    sophisticated way at all possible.  I mean, when -- and I say

19    this with all seriousness.  When we look at his letters, they

20    are almost silly the way that he's written them, in the sense

21    that he's got his name literally right under them.  They're

22    almost just like -- it's, like, one long sentence.  I mean,

23    that's it.  There's nothing in the context of these letters that

24    would provide any context for which anyone would necessarily

25    think this is coming from somebody who has the ability to carry

1    this out.

2              THE COURT:  Okay.  I think I've -- I understand and

3    follow your point.

4              MR. LOCKHART:  Thank you, Your Honor.

5              So essentially we're asking for a 24-month sentence.

6    We think that knowing what's known about Mr. Lane now should

7    augment the 77-month sentence that he received originally.

8    Obviously he's going to have three years of supervised release.

9    That sentence will have to be done before any sentence is served

10   here.

11             I think that to the extent that Mr. Lane is going into

12   the federal BOP and is going to have, I believe, access to more

13   reliable, adequate mental healthcare, I think that we will -- we

14   are much less likely to see these types of letters come from

15   Mr. Lane, particularly where the ones that we saw that were sent

16   from Walton County jail and the ones that we've seen in this

17   case certainly don't even make sense to the extent they were

18   sent to Polk County, for example, and then the other one sent

19   during what was obviously a mental health event.  That's, I

20   would submit, uncontested on the record.

21             So for all those reasons, Your Honor, I don't

22   necessarily think that it's necessary to sentence him to more

23   than 24 months, together with the fact that he has a 77-month

24   sentence.  And I think it's safe to be able to delineate a

25   lesser sentence than the one that he received in 2012 by virtue

1    of everything that we know about him.  And again, I can't

2    underscore that enough.  Very little of that was even known

3    during that time.

4         But I would submit, too, that having inmates send

5    letters like this, particularly with his background and history,

6    but to where the sentencing system, if not looked at critically,

7    would result in him receiving 30-year sentences, 30-year

8    sentences, 30-year sentences, would cause a taxpayer or a

9    general member of the public to really ask, Do we -- is this

10   something that's really necessary, particularly when we start to

11   look at Mr. Lane and we know his background and history and the

12   context of how this was all created.

13        So it becomes kind of a situation where the tail is

14   allowed to wag the dog, essentially, if this were to continue.

15   And in large part, it's being worsened by the fact that, you

16   know, the Government has chosen to charge him as severely as

17   possible with three prevailing statutes, one that carries a

18   five-year max, one that carries a ten, and then one that carries

19   a life offense.  And that's not going to have any significant

20   impact on a person that's largely doing these offenses when

21   they're having severe mental health events and with this

22   history.

23        So this is not really the proper candidate for that

24   kind of severity of sentence.  And I would submit that based on

25   the entire record, I'd ask the Court to seriously vary down.

1    Even if the Court disagrees with me with regard to the 24

2    months, I would seriously ask this Court to downwardly depart,

3    if not at 24 months, something very close to it, Your Honor.

4    And obviously he'll be on supervised release for whatever this

5    Court chooses.

6              THE COURT:  Okay.  I understand.  Thank you,

7    Mr. Lockhart.

8              Mr. Lane, is there anything you'd like to say today?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  Okay.  You're fine where you are, as long

11   as I can hear you.

12             THE DEFENDANT:  My whole life, since I was 4, I been

13   beat by my stepdad.  The first time I ran away, I was in the

14   first grade.  I told somebody about it, my best friend when I

15   was in first grade.  I told his mom.  They called the cops.  The

16   cops took me back home, did nothing about it.

17             When I turned 11, I got tired of getting beat up.  So

18   I fought back.  I went to jail every time -- detention center,

19   JAC center -- because my stepdad called the cops on me.  Even

20   though I went to school, I showed the bruises.  The Department

21   Children and Families came, HRS came, cops came, nobody ever

22   believed me.  Nobody ever did nothing for me.  Nobody ever tried

23   to help me.

24             So my own mother testified against me three, four

25   times in juvenile court for my stepfather; and he's the one who

1   always got drunk.  He's the one who always beat me up.  And one

2   time I went to jail simply because he pushed my mother, and I

3   stood up and told him, Don't touch my mother, my little brother

4   like you hit on me.  And she still went to court against me.

5          I mean, I tried my hardest.  I tried my hardest to be

6   do the best I could when I was growing up.  I went to school and

7   it just never worked.  I always got kicked out.  I slept in

8   dumpsters, slept in playpens.  I slept on the side of the road.

9   I didn't shower for weeks at a time.  Sometimes I didn't eat.

10  They sent me in program because I did something stupid because I

11  got tired.

12         My whole life I been asking people to help me.  Don't

13  nobody want to help me.  Don't nobody want me.  Don't nobody

14  want to do nothing for me.  Ever.  So I did drugs.  I did heroin

15  when I was 12.  I did methadone, coke, every type of

16  prescription pill you could do.  I've cut myself a bunch of

17  times trying to kill myself.

18         And then I came to prison my first time for hanging

19  around with the wrong people because all I ever wanted was a

20  family.  I wanted friends.  I wanted people that's going to be

21  there for me.  But I picked the wrong people.

22         And deep down inside of me, I got the loyalty thing to

23  where no matter what, if I call you my friend, I can't -- I

24  can't leave you.  No matter if you're going to hurt me longer or

25  not, I can't leave you alone.  I can't turn my back on you

1    because everybody turns their back on me.

2          So I went to prison and I got out and I got a job.

3    But I got in an argument with my division superintendent about a

4    female that I didn't even care about, I didn't even like, that

5    was just my friend.  And I quit.

6          And I tried to get a job.  I tried for two months to

7    get a job, and nobody wanted to hire me because I -- because

8    they said I stabbed two people.  I wouldn't ever stab two

9    people.  They wanted to stab me.  The cops didn't put in the

10    arrest report how they stabbed me in my chest, and I still bear

11    the scars on my arm from where they stabbed me.  All I did was

12    defend myself.

13          I don't make excuses for nothing that I did.  I did

14    what I did.  I can't -- I don't want to blame nobody.  I don't

15    blame my stepdad.  I don't blame my mom.  I don't even care no

16    more about them.

17          The first time I wrote a letter, I didn't write a

18    letter because I just thought it was funny, because I wanted

19    y'all to kill me.  I was tired of living.  I was living at FSP.

20    I was tired of seeing correctional officers beat people, spray

21    us for no reason.  It's what I went through for the last 14

22    years of my life.

23          This case right here, I was on CSU.  I honestly

24    witnessed seven different people be severely beaten by

25    correctional officers.  I wrote grievances because these people

1    were mentally -- they were more messed up mentally than I was.

2    They couldn't think, they couldn't talk, they couldn't act.

3    They were so drugged up on drugs.  And these people would

4    whisper at the door to ask them to move when they were on

5    suicide watch.  And then five of them would take a shield and

6    run in on them and beat them up, and all you would hear would be

7    banging and them yelling, Stop resisting.

8              I watched a kid who was terrified.  They made him come

9    out of his room, and he was so terrified that he honestly

10   defecated in his hand and rubbed it on his face and was crying

11   and screaming.  And they ran down on him, and they beat him

12   again and again and again.

13             And then they starved me for three, four days.  I was

14   on suicide watch.  They starved me for three days because I told

15   them I don't want to be there.  I'm not -- I'm afraid.  I don't

16   want to be here.  I'm afraid.  I don't want to be here.  Please

17   let me go.  I been trying to stop gangbanging, and I really

18   honestly have.  I really don't want to be in a gang no more, but

19   the only thing that DOC respects is if I tell them names.

20             There's only one person out there that I care about.

21   That's my little brother.  He's got a daughter and a son.  I

22   will not tell nobody no names of anybody on the street to

23   jeopardize my little brother.  I don't care.  I don't care.

24   They can kill me for all I care, but I will not jeopardize my

25   little brother and his son and his daughter.  So I can't turn

1  around and tell these people, Look, I want to renounce my gang,

2  but I can't gave you no names.  They don't respect that.

3          I don't remember writing this letter.  It doesn't mean

4  I didn't do it.  It just means I don't remember doing it.  I

5  never been to Polk County.  I don't know nothing about Polk

6  County.  But I can tell you honestly that I suffer so bad PTSD

7  because I have honestly been beaten at least four times in

8  prison to where I've been in handcuffs, and they sprayed me with

9  five different kinds of mace, and kneed me in my face six or

10  seven times where my nose busted every time.  And this hasn't

11  happened just one time.  It's always in handcuffs.

12          I try to be a man.  I don't know how to be a man.  I

13  don't got no dad.  I never had a dad.  I don't even know who my

14  dad is.  My stepdad, I tried numerous times.  I told him, Man,

15  I'm sorry.  Please, I just want to be your son.  I don't want

16  any problems.  I don't want to go through this.

17          Same thing happened in 2005 when I got out.  I

18  couldn't get a job.  He would get drunk.  He was selling me out,

19  telling me, I'm not afraid of you, I'll whoop you.  And I wasn't

20  even trying to make him afraid of me.  And it just got to the

21  point where I just -- I just -- I didn't care.

22          I started smoking crack.  I smoked crack for like

23  three months, every day.  I was so high on crack the day they

24  arrested me that they had to keep me in booking for seven days

25  because I couldn't -- my body would not go anymore.

1          The day that I got arrested, I told my codefendant,

2   David Huff, I said, Man, I don't want to do this.  I don't feel

3   right.  We're going to jail.  I knew I was going to jail.  I

4   felt it.  I felt it.  God told me I was going to jail if I went

5   with him.  But, again, I can't turn my back on nobody.  No

6   matter how hard it is, no matter nothing.  I can't.  It's hard

7   for me to do that because every life, somebody turned their back

8   on me, my whole life.  Nobody ever cared about me.  I tried my

9   hardest.

10          Even my uncle.  I love my uncle to death.  He's my

11   friend, he's like a brother to me, but he's grabbed me by my

12   throat and throw me up against the wall because he has his own

13   issues, and told me, When I'm a hundred, you'll never be able to

14   whoop me.  And never one time in my mind have I ever thought

15   about hurting my uncle.

16          My aunt swears that I stole something, a DVD player

17   from her when I didn't, all because when I was hungry and

18   homeless and living on the streets.  I didn't break into my

19   uncle's house.  I knew where the key was.  I went in and I took

20   his change out of his change jar.  There was only $40.  I was

21   hungry.

22          But I even -- even if he didn't have the change, I

23   know that I could have went to my uncle and said, I need some

24   money, I'm hungry.  He would have gave it to me because he

25   always gave it to me.  There was a difference and I explained

```
1    it, but I got blamed for something by my aunt that I didn't do.
2           My whole life --
3           THE COURT:  Mr. Lane, I'm going to ask you to wrap it
4    up.  I've got to move on to the prosecutor's presentation.
5           THE DEFENDANT:  Yes, ma'am.
6           My whole life I've been in prison.  I don't want to
7    die in prison.  I don't want to live in prison for the rest of
8    my life.  I mean, I just ask that you have mercy on me and you
9    let me get the 24 months and give me some type of therapy when I
10   get out and give me some help.  I got some plans when I want to
11   get out.
12          I mean, I learned how to tattoo for the last 14 years.
13   And tattoo is acceptable in society, and I'm good at it.  I want
14   to be the best that I can.  I want to own my own business.  I
15   want to go to school.  I want to do something with myself.  I
16   don't want to waste away in prison.  I'm tired of all the hate,
17   the pain, the anger, the rage, everything that is in prison.
18          I get nothing.  I've never gotten nothing.  I never
19   got a chance.  I just ask that you give me one chance.  I give
20   you my word.  I don't promise; I give you my word that I'll be
21   the one person that you ever gave a chance to that you'll never
22   regret it.  I just want a chance.
23          THE COURT:  All right.  Thank you, Mr. Lane.
24          THE DEFENDANT:  That's all I have to say.
25          THE COURT:  Thank you.
```

1          All right, Mr. Goldberg.

2          MR. GOLDBERG:  Thank you, Your Honor.  I believe, if

3     the Court will indulge me, I can be efficient.

4          THE COURT:  Take the time you need.

5          MR. GOLDBERG:  The defendant asked for a chance, but

6     he's a career offender.  He's had chances.  And that's the

7     problem we find ourselves in, is that someone who's so upset

8     about being victimized his whole life is committing crimes that

9     are just victimizing others.

10         So when we review the sentencing memorandum of the

11    defendant, as well as the defendant's argument here today, there

12    are some fundamental flaws that I just want to briefly point

13    out, the first of which is that suggesting the defendant receive

14    a break or mitigation in sentencing because he signed the

15    letters or the FBI could find him ignores the secretary that

16    opened the letters.  She's the one that had the white powder

17    fall in her lap.

18         He didn't send the letters to the FBI.  He didn't send

19    them to the National Institute of Health.  He sent them to an

20    office that was opened by a secretary.  And I would suggest to

21    the Court that when the secretary opens an envelope and white

22    powder falls out of it into her lap, and it says, "Fuck you,

23    die, you're going to die, this is anthrax," she doesn't think to

24    herself in a perfectly placid way, This is unsophisticated,

25    we'll be fine.  No.  She thinks she's going to die.  And we know

1    that because hazmat and biothreat protocols took place in

2    buildings, and rooms and offices had to be cleared because she

3    thinks she's going to die.

4         So lack of sophistication may mean he doesn't receive

5    an adjustment for being sophisticated, but I don't -- sure that

6    that's mitigation because you can't just think about it from the

7    defendant's perspective.  It's also the victim's perspective.

8         The second flaw regarding assertions that there may be

9    an overly lengthy sentence or disproportionate sentences and the

10   references to statistics and *Washington Post* articles, and so on

11   and so forth, well, the problems with those references is those

12   are Chapter 2 sentences.  And this is going to be a Chapter 4

13   sentence, and that is a problem for the defense.  Those aren't

14   exactly comparable.

15        A lot of those cases where they're getting probation

16   and 20 months, they're not career offenders.  This defendant has

17   prior convictions for aggravated battery, for robbery, for

18   mailing threatening communications, and various other crimes;

19   and that's why he's a career offender, which doesn't make him

20   comparable to those that are cited.

21        Another flaw in the argument is the defendant's

22   consternation with being charged under Section 2332(a), the

23   weapons of mass destruction statute.  It's misguided to take

24   that out -- not inappropriately, it's a defense argument -- but

25   to suggest that that somehow is unwieldy or unfair.  And I'd

1    move to admit --

2              And if I may publish, madam clerk.

3              This would be Government Exhibit B.  It's referenced

4    in the Presentence Investigation Report.  And the reason why the

5    defendant's consternation with the charging in this case is

6    misguided or without merit is because if we look at Government

7    Exhibit B, the defendant already had a bite at that apple.

8              If I may approach, Your Honor.

9              THE COURT:  Mm-hmm.

10             MR. GOLDBERG:  It's the judgment from the Southern

11   District of Florida.  The defendant already had the opportunity

12   to simply be charged with those lesser statutes and simply be

13   convicted of those lesser --

14             THE COURT:  Right.  But the fact, Mr. Goldberg, that

15   you-all can technically charge someone of an offense under a

16   statute that carries a more serious penalty, that doesn't change

17   the offense conduct and the fact that there's a range of conduct

18   here under all three of these statutes.  But obviously the one

19   you chose to charge him under carries a lifetime maximum, and

20   there are far more serious offense conduct that would be

21   appropriate under that statute than this.

22             MR. GOLDBERG:  Well, it's interesting you bring that

23   up, Your Honor, and it's a good point.

24             THE COURT:  Okay.

25             MR. GOLDBERG:  But again -- obviously the judicial

1    branch and the executive branch can disagree --

2            THE COURT:  Correct.

3            MR. GOLDBERG:  -- but there's an indictment that

4    I'm -- will be prosecutor on pending before this Court right now

5    where the defendant sent many more letters and threatened

6    explosives.  And by the defendant's own admission, someone in

7    prison would have the ability, potentially, to carry out an

8    explosives rather than anthrax.

9            But the reason why this defendant gets charged more

10   harshly -- in that indictment there is not a weapons of mass

11   destruction charge right now.  There's threatening

12   communications and an 844(e) violation, which is threat of

13   explosives.  This defendant is different because of his criminal

14   history.

15           THE COURT:  But those are -- and you know they're

16   different.  They're different under the guidelines; they're

17   different axes.  I mean, you have Chapter 4, and you have

18   Chapter 2.  And Chapter 2 deals with the offense, and that's why

19   you have an offense level.  And Chapter 4 deals with recidivism,

20   and that's why he's a career offender.  But they're not one and

21   the same.

22           MR. GOLDBERG:  No, but they -- but charging it in a

23   certain way will impact -- while it gives the authority to the

24   Court, it changes the statutory potential penalties that this

25   Court can sentence him to, and that matters to the Government

1   because there is an aggravated level here.

2           THE COURT:  I understand why -- I understand why the

3   executive branch chose to charge it the way you charged it.  But

4   from my standpoint, from the judicial branch, it doesn't change

5   the offense conduct.

6           MR. GOLDBERG:  I'm not suggesting that it does.  What

7   I'm suggesting is that it's not a reason for mitigation, which

8   the defense essentially suggests, that he shouldn't have been

9   charged with this.  That's all I'm stating, Your Honor.  The

10  facts fit this statute, and --

11          THE COURT:  Well, they do, but so do other facts and

12  other defendants' conduct fit that statute.  It's far more

13  serious than what this individual did.  And I am not minimizing

14  the seriousness of it; but when we're talking about a range of

15  conduct, I'm sure you don't disagree that there are far more

16  serious cases prosecuted under that statute than this one.

17          MR. GOLDBERG:  That may be true, but those cases --

18  when cases are brought by the prosecuting authority, the

19  executive branch does consider prior criminal history as to what

20  exposure a defendant should face.

21          THE COURT:  I understand you-all do that.

22          MR. GOLDBERG:  Yes.  That's the only point I'm trying

23  to make, Your Honor.  And the Government -- I'm not even here

24  today to suggest that a guideline range sentence is appropriate.

25  The guidelines here are severe.  They're understandably severe.

1    He's a career offender, and this is serious conduct.  What I am

2    here to suggest is a variance that is being suggested by the

3    defense is without merit.

4         The defendant has already been sentenced to 77 months

5    in the Southern District of Florida for relatively the same type

6    of conduct, and that did not deter him.  That conduct was

7    committed while he was already in a prison setting.  He's in a

8    structured setting, and he has still not been deterred.  And

9    obviously Your Honor's sentence has to consider deterrence of

10   others as well as protecting the public, which is impacted by

11   when the defendant will be released.

12        So the Government -- again, I'm not suggesting a

13   guideline sentence is appropriate.  The guidelines are

14   appropriately calculated.  But they are driven by his unyielding

15   career of criminal offenses.  I mean, he just keeps committing

16   criminal offenses.  Is it mitigating that he has mental health

17   issues?  Arguably.  I can see that.  It's also aggravating

18   because that creates a question of safety of the community.

19        The best place for him, quite frankly, may be the

20   Bureau of Prisons because he will hopefully receive mental

21   health treatment.  And incapacitation and rehabilitation are not

22   mutually exclusive.

23        THE COURT:  Although the Supreme Court has said I

24   cannot take rehabilitation into account in terms of length of

25   sentence.

1          MR. GOLDBERG:  You cannot lengthen a sentence based on

2    rehabilitation, but you can consider rehabilitation as part of

3    the sentence.

4          THE COURT:  But not to lengthen it.

5          MR. GOLDBERG:  But not to lengthen it.  I'm not asking

6    you to lengthen it because of rehabilitation.  It's the

7    Government's position that a severe sentence is warranted

8    because he needs to be incapacitated.  He's a danger.  He's led

9    a life of crime, and it's dangerous.

10          THE COURT:  All right.  Thank you.

11          All right.  I agree both with some of what

12   Mr. Lockhart has presented to the Court and also some of what

13   Mr. Goldberg has presented to the Court.  I do not believe that

14   the 262-to-327-month guideline range is appropriate in this case

15   or warranted in this case.  In my view, it seriously or

16   significantly overrepresents the conduct at issue here.  With

17   that said, a 24-month sentence is equally as inappropriate,

18   given Mr. Lane's criminal history.

19          The sentence I'm going to impose -- and it does,

20   obviously, and will run consecutive with the state court

21   sentence -- is a 120-month sentence.  And so the -- Mr. Lane

22   will end up serving 16 1/2 years for mailing several fake

23   anthrax threats to governmental agencies.

24          Mr. Lane, you're, no question, a product of your

25   upbringing.  It's tragic.  It's heartbreaking, to be honest.  I

1    mean, it truly is.  I mean, from everything I've read in the

2    records that were submitted and -- your parents, stepfather,

3    mother, reprehensible.  And kicked you out of the home at age

4    11.  The life you led subsequent to that is completely

5    predictable, as sad as it is.

6         But I agree with what Mr. Goldberg has said, and that

7    is the concern for the safety of the public is paramount.  And I

8    read -- you know, obviously I read all of the mental health

9    evals that were submitted, both Dr. Spoerl's, as well as the

10   jail records, and then also, of course, the Bureau of Prisons'

11   eval report.  And much of what's contained in the report about

12   your background, as I said, is tragic.  But the evaluators all

13   seem to agree about certain things that give me serious concern

14   about the safety of the public.

15        Your diagnoses are severe and concerning, most notably

16   the antisocial personality disorder diagnosis, the adjustment

17   disorder with mixed disturbance of emotions and conduct.  And

18   although that's a BOP diagnoses, Dr. Spoerls, in her report,

19   doesn't diagnose you with that condition or disorder; but the

20   conclusions she reaches are consistent with it, and notably your

21   inability to regulate and control your mood and your emotions.

22        The BOP report also references your inability or

23   unwillingness -- and I'll say inability -- to express remorse

24   for your behaviors, a lack of insight into how your antisocial

25   behavior influences your patterns of thinking and perceiving and

relating to others, and the fact that these behaviors seem to be ingrained into your personality and have been present for an extended period of time.  And that's reflected in your criminal history dating all the way back to the age of 15.  And I believe there's been reference -- maybe not in the criminal history section of the presentence report but in the mental health records, there's reference to violent behavior prior to even age 15, at age 13 and 14.

The BOP record -- report goes on to state that Mr. Lane has no insight into the psychological factors influencing his personality and does not see these as problematic.  And that's also consistent with Dr. Spoerls.

Now, the antipsychotic medications, medication management, hopefully is going to improve that, but there's also a reference by Dr. Spoerl to your history of being prone to non -- being noncompliant with your medication.

The criminal history is -- and set aside the threatening letters.  The criminal history is full of violence. I mean, aggravated battery with stabbing at age 17, and then the robbery with the firearm at gunpoint, which is what you're serving time for now.  There are burglaries.  You had a false report of a bomb or a bomb threat at the age of 15.

The letters themselves, as you know, are serious. Even if you didn't have the ability to carry out the threat, still very serious.  I can only imagine the poor administrative

1    assistant who opened the letters.  And you've sent a number of

2    them.  You're getting ready to serve a 77-month sentence for the

3    exact same thing.  And then we have more of it in this case, and

4    then even after your arrest in this case, you sent another

5    letter.  It was intercepted, fortunately, but you sent it from

6    Walton County.

7            I'm not going to sentence you to life.  I mean, I

8    don't believe that the offense conduct would justify that, in

9    spite of your criminal history.  And I'm not going to sentence

10   you to what the guideline calculation is.  Even the Government

11   recognizes the severity of the 262 to 327 months.  But in this

12   case, we have separate victims from your Southern District of

13   Florida case that has to be respected and recognized.  And the

14   last sentence you got for this type of behavior didn't deter

15   you, and -- 77 months, and so this sentence has to be something

16   more than that.  If not to deter you, to deter others.

17           That's the sentence I'm going to impose.  Again, a

18   120-month sentence consecutive to the state court sentence.

19           And, Mr. Lockhart, is there a request for designation?

20   I'm not sure if I saw that.

21           MR. GOLDBERG:  Your Honor, just so the record's clear

22   while Mr. Lockhart is consulting, you've said now twice it'll be

23   consecutive to the state sentence.  I assume it will also be to

24   the federal sentence as well.

25           THE COURT:  I meant the federal sentence.  Thank you

1    for correcting me.

2            MR. LOCKHART:  Can we recommend Coleman, Your Honor,

3    if the Court would?  I don't know what the security

4    classification will be --

5            THE COURT:  Okay.

6            MR. LOCKHART:  -- but I would recommend Coleman.

7            THE COURT:  I won't speak to the security

8    classification.  I'll leave to that the Bureau of Prisons.

9            MR. LOCKHART:  Right.

10           THE COURT:  But I will recommend the Federal

11   Correctional Complex at Coleman, and they will decide the

12   appropriateness of the security level.

13           All right.  Mr. Lane, if you would, please rise.  I do

14   need to formally pronounce your sentence.

15           Mr. Lane, at this time the Court does formally

16   adjudicate you guilty of Counts One, Two, Three, and Four of the

17   indictment.  That's consistent with your plea of guilty to those

18   charges.  I do find that the Presentence Investigation Report is

19   accurate.  I order the findings of the report incorporated into

20   the following sentence.

21           Pursuant to the Sentencing Reform Act of 1984 and all

22   amendments to that law, it is the judgment of this Court that

23   the defendant, Justin B. Lane, is hereby committed to the

24   custody of the Bureau of Prisons to be in prison for a term of

25   120 months as to each of Counts One, Two, Three, and Four, with

1    those terms to run concurrent, one with the other; however, the

2    total sentence will be served consecutive to all other sentences

3    previously imposed, both in the Southern District of Florida as

4    well as in the Palm Beach County case, and that's the sentence

5    that you're currently serving in the Florida Department of

6    Corrections.

7         I do identify Mr. Lane as a person in need of an

8    intensive and focused substance abuse treatment program, both

9    during his incarceration as well as on his reentry through a

10   residential reentry center.  I recommend his placement into the

11   BOP's RDAP program.  I also strongly recommend cognitive

12   behavioral therapy programming for Mr. Lane.

13        Mr. Lane, I'm not going to impose any financial

14   penalty or fine in your case; however, there is a special

15   monetary assessment that I must impose.  It's nonwaivable.  It's

16   in the total amount of $400, 100 for each of the four felony

17   counts of conviction, and that is due and payable immediately.

18        And I do recommend that the Bureau of Prisons

19   designate you to serve this sentence at the Federal

20   Constructional Complex in Coleman, Florida.

21        All right.  You may be seated.

22        When you're released from custody, Mr. Lane, you'll be

23   placed on a period of supervision for a term of three years as

24   to Counts One and Two, and five years as to Counts Three and

25   Four.  Those terms will run concurrent, one with the other.

Supervision will be under the mandatory and standard conditions
adopted for use in this district, together with the following
special conditions:

You'll be evaluated for substance abuse as well as
mental health and referred to treatment as deemed necessary
through that process.  Your treatment should include cognitive
behavioral therapy.

You'll be subject to the Court's standard search
condition which applies in any felony case, which means during
the term of your supervision, you'll be subject to a search of
your person, property, home, or vehicle by a United States
probation officer if the officer has reasonable suspicion to
believe that you have violated the terms of your supervision and
also reasonable suspicion to believe that the place to be
searched contains evidence of that violation.  Any such search
must be conducted in a reasonable time and manner.  Your failure
to submit to any such search would be grounds to revoke your
supervision.

I've stated the basis for my decision in this case,
and I do find that under 18 U.S.C. 3553(a), and after
considering all of those factors, as well as your offense
conduct and your personal history and characteristics, that a
sentence of 120 months is sufficient but not greater than
necessary to comply with the purposes of sentencing set forth
under the law.  And I do recognize that that is a variance from

1      the advisory guideline range.

2              The total sentence is 120 months, five years of

3      supervision, a $400 special monetary assessment.  And I was

4      remiss in failing to also impose restitution that is to be

5      ordered in the amount -- and is ordered in the amount of

6      $1,884.91, and that is to be made payable -- I don't see who

7      that is to be made payable to.

8              MR. GOLDBERG:  Your Honor, it's in paragraph 107a in

9      Document 48.  It's the Polk County Fire Rescue.

10             THE COURT:  Hold on just a moment.  Say the paragraph

11     again, please.

12             MR. GOLDBERG:  107a in Document 48.

13             THE COURT:  Thank you.

14             All right.  So that is to be made payable, as

15     indicated in 107a of -- paragraph 107a of the presentence

16     report, to the Polk County Fire Rescue to the attention of the

17     individual noted and at the address noted in 107a.

18             Mr. Lockhart, is there anything else you'd like to

19     place on the record?

20             MR. LOCKHART:  No, Your Honor.

21             THE COURT:  Mr. Goldberg?

22             MR. GOLDBERG:  Your Honor, only because I may have

23     heard it wrong, as it relates to supervised release.  I believe

24     the three-year would be Counts One and Three, the five-year

25     would be Counts Two and Four.

1          THE COURT:  You are correct.  That should be changed,

2    modified.

3          And I believe we actually had one other modification,

4    Officer Link, in paragraph 24.  Mr. Goldberg's correction made

5    me recall that we had this discussion earlier.

6          Paragraph 24, there should be a change or an edit of

7    the guideline for Counts One and Three, as opposed to Counts One

8    and Two, which is 2A6.1, would have resulted in a

9    cross-reference.  That should be reflected in the Statement of

10   Reasons.

11         MR. GOLDBERG:  Thank you, Your Honor.  Nothing

12   further.

13         THE COURT:  Thank you.

14         All right.  Mr. Lane, you do have the right to appeal

15   from this decision.  If you choose to do so, your Notice of

16   Appeal must be filed within 14 days of the date of the Court's

17   written judgment, not today's date.  What I've orally pronounced

18   as your sentence will be put into writing and filed in our court

19   records in the next week or two.  Your 14 days to appeal runs

20   from that date, again, not from today's date.

21         If you can't afford the cost of an appeal, you may

22   file for leave to appeal at no cost to you.  Mr. Lockhart will

23   talk to you further about your appeal rights, but do keep in

24   mind that 14-day window is strictly enforced.  If you intend to

25   challenge this sentencing decision on appeal, you should do so

1    within that time frame.

2            Otherwise, Mr. Lane, good luck to you.

3            The Court will be in recess.

4        *(Proceedings adjourned at 10:23 a.m.)*

5                    \* \* \* \* \* \* \* \*

6        I hereby certify that the foregoing is a true and correct
7    transcript of the stenographically reported proceedings held in
     the above-entitled matter, pursuant to the provisions of Section
8    753, Title 28, United States Code.

9                                                 9/18/19
10   _____        _____
     Julie A. Wycoff, RMR, CRR               Date
11   Official U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25